FILED
2022 Apr-08  AM 10:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SPINESOURCE, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 5:18-cv-01306-MHH** |
| | } | |
| **VARASPEC, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

In this action, SpineSource, Inc. seeks to recover from Varaspec, Inc. funds that SpineSource loaned to Ashlee Duesing and Michael Duesing in 2012. The Duesings used the money they received from SpineSource to support their family and the family business, PGI (short for Produkt Glas, Inc.). PGI is the predecessor to Varaspec.

At its heart, this is a family dispute. Sloan Beatty, the president of SpineSource, is Ashlee Duesing's brother. (Doc. 43, p. 10). From February 13, 1999 to February 14, 2017, Ashlee Duesing was married to Michael Duesing. (Doc. 34, p. 4, ¶¶ 29–31; Doc. 34, pp. 64–68). Michael Duesing formed PGI in 2005. (Doc. 1-1, p. 2, ¶ 3; Doc. 34, p. 1, ¶ 2). PGI merged into Varaspec in 2016. (Doc. 1-1, p. 2, ¶ 4; Doc. 34, p. 2, ¶ 13).

1

SpineSource contends that it loaned a total of $120,000 to Ashlee Duesing and Michael Duesing and that the $120,000 has not been fully repaid. In its complaint in this action, SpineSource named Michael Duesing, PGI, and Varaspec as defendants. (Doc. 1-2). In 2019, Michael Duesing filed for bankruptcy and received an order of discharge. (Doc. 34, pp. 4–5, ¶¶ 33–36; Doc. 34, pp. 69–74). Because of Michael Duesing's bankruptcy and PGI's merger with Varaspec, SpineSource now proceeds against Varaspec only. (Docs. 25, 42, 46). Varaspec has asked the Court to enter judgment in its favor. Varaspec contends that the loan at issue was a personal loan, not a loan to PGI, and that any responsibility Michael Duesing may have for the loan proceeds was discharged in his bankruptcy proceedings. (Doc. 35).

This opinion resolves Varaspec's motion for summary judgment. The Court begins with an overview of the summary judgment standard. Then, applying that standard, the Court summarizes the summary judgment evidence, presenting the evidence in the light most favorable to SpineSource. Finally, the Court evaluates the parties' evidence under the legal standards for breach of contract, money had and received, money lent, and unjust enrichment, the state law claims through which SpineSource seeks to recover its alleged loss.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"[A] litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020). Accordingly, the Court views the evidence in the light most favorable to SpineSource and draws all reasonable inferences from the evidence in its favor.

## II.

Michael and Ashlee Duesing married on February 13, 1999, (Doc. 34, p. 4, ¶ 29; Doc. 34, p. 62), and Michael Duesing formed PGI on November 7, 2005, (Doc. 1-1, p. 2, ¶ 3; Doc. 34, p. 1, ¶ 2). In August 2011, Ashlee Duesing replaced Michael Duesing as director, president, and secretary of PGI and was appointed Michael Duesing's attorney-in-fact. (Doc. 34, pp. 1–2, ¶¶ 3–7; Doc. 34, pp. 6–18).[1] Ashlee Duesing's control over PGI coincided with a period of nine months from August 30, 2011 to May 25, 2012 when Michael Duesing was incarcerated. (Doc. 44, p. 2). During those months, Ashlee Duesing was running the company in Michael Duesing's absence. (Doc. 43, p. 9).

While Michael Duesing was incarcerated, PGI began to experience financial difficulties. Ashlee Duesing testified that in 2011, PGI had "landed a very large job

---

[1] Sloan Beatty was appointed attorney-in-fact in the alternative to Ashlee Duesing. (Doc. 34, p. 2, ¶¶ 6–7; Doc. 34, pp. 8–18).

with NBC Universal." (Doc. 43, p. 10). While Ashlee Duesing was managing that job and another, PGI lost $60,000 because of problems with the jobs. (Doc. 43, p. 10). According to Ashlee Duesing, the company's loss "kind of put [her] in a hole where [she] had to make a decision in April of 2012 either to close the company and put three people out of work or to borrow money from [her] brother to keep [them] going for another twenty-five days until Mike could get back out and start working again." (Doc. 43, p. 10). Ashlee Duesing testified that her brother Sloan "generously offered a line of credit he had with Bryant Bank for [them] to be able to draw on it." (Doc. 43, pp. 10–11; *see also* Doc. 43, p. 12).[2]  The money was meant to keep PGI going. (Doc. 43, p. 11). Michael Duesing supported Ashlee Duesing's decision to borrow money from her brother. (Doc. 43, pp. 12, 19).

Ashlee Duesing initially borrowed $50,000 on May 4, 2012. On May 7, 2012, she deposited the funds at a Wells Fargo branch office into a Wells Fargo account in the name of Ashlee Duesing and Michael Duesing. (Doc. 34, p. 3, ¶ 14; Doc. 34, pp. 25, 28, 33, 53; Doc. 43, pp. 12–13).[3]  On May 10, 2012, Ashlee Duesing

_____

[2] It appears that Ashlee Duesing submitted a document in her divorce proceedings that contained a list of expenses, and she included "a loan from Sloan" on the list. (Doc. 43, pp. 7, 10–11). SpineSource provided only excerpts from the transcript of the Duesings' divorce hearing. As a result, the Court has had to make inferences to connect some of the dots. Per the initial order in this case, the Court asks parties to provide complete transcripts to avoid possible confusion. (Doc. 17, p. 11) (explaining the requirement for complete deposition transcripts and associated exhibits in summary judgment proceedings).

[3] Given the deposit in a branch store, it appears the loan was made by check. There is no check in the record that would allow the Court to determine whether the loan came from a SpineSource

transferred $30,000 from the Duesings' savings account to the couple's checking account, and on May 11, 2012, she wrote check 2879 for $30,000 to PGI. (Doc. 34, p. 3, ¶ 19; Doc. 34, pp. 25, 28, 31–33, 53; Doc. 43, pp. 12–13). She kept $20,000 to cover Michael Duesing's salary. (Doc. 34, p. 25; Doc. 43, p. 13).[4]

On July 11, 2012, Ashlee Duesing deposited a $20,000 check into the checking account that she shared with Michael Duesing; she transferred $17,000 into the couple's savings account on July 12, 2012. (Doc. 34, p. 3, ¶ 20; Doc. 34, pp. 25, 38, 40, 53).[5]

---

account or a personal account belonging to Mr. Beatty. Viewing in the light most favorable to SpineSource the evidence, including a document that Ashlee Duesing created regarding the loan proceeds, the Court regards the May 2012 loan as a loan from SpineSource, not Mr. Beatty. (Doc. 34, pp. 25–27).

[4]According to a handwritten document that Ashlee Duesing seems to have created, Mr. Beatty made an interest payment on the first $50,000 loan on May 30, 2012, and Ashlee sent Mr. Beatty a check to cover the interest on June 5, 2012. (Doc. 34, p. 25). The Wells Fargo statement for the May 17, 2012–June 18, 2012 period is not in the record, so the Court cannot confirm the interest payment check.

[5] Again, there is no check in the record that would allow the Court to determine whether the loan came from a SpineSource account or a personal account belonging to Mr. Beatty. Viewing in the light most favorable to SpineSource the evidence, including the document that Ashlee Duesing created regarding the loan proceeds, the Court regards the July 2012 loan as a loan from SpineSource, not Mr. Beatty. (Doc. 34, pp. 25–27).

Mr. Beatty made several interest payments on a line of credit in July and August 2012, and Ashlee Duesing indicated that she sent him a check to cover those interest payments on July 17, 2012. (Doc. 34, p. 25). The Duesings' bank records do not reflect a check for $1,000 in July of 2012. There are checks for $240.00 and $34.00 on July 17, 2012 and a check for $6,734.00 on July 18, 2012. (Doc. 34, pp. 38–39).

Finally, on August 31, 2012, Michael Duesing borrowed $50,000. (Doc. 34, p. 3, ¶ 22). The money was deposited directly into the Duesings' Wells Fargo account from a SpineSource, Inc. account. (Doc. 34, pp. 25, 44, 53).[6] On September 5, 2012, Michael Duesing wrote check 2946 for $45,000 to PGI. (Doc. 34, p. 3, ¶ 23; Doc. 34, pp. 25, 45, 47, 53).[7] The Duesings retained $5,000 for savings. (Doc. 34, p. 25).

Overall, the Duesings borrowed $120,000. (Doc. 34, p. 4, ¶ 24). The Duesings transferred $75,000 to PGI and retained $45,000. PGI records suggest that PGI made several payments to Ashlee Duesing on the loans, but the documentation is unclear, and there is no testimony in the record regarding the repayments. (Doc. 34, pp. 53–60). In a document that she created, Ashlee Duesing indicated that she made several payments directly to Bryant Bank, the bank where SpineSource had its line of credit, and she made some interest payments to Mr. Beatty. (Doc. 34, pp. 26–27; Doc. 34, p. 44 (August 31, 2012 bank statement entry identifying Bryant Bank account in the name of SpineSource, Inc.)). Ashlee Duesing's notes indicate

---

[6] In his affidavit, Michael Duesing stated that he borrowed the money on August 30, 2012, but documents establish that he borrowed the money on August 31, 2012. (Doc. 34, pp. 3, 25, 44, 53).

[7] In his affidavit, Michael Duesing stated that he wired the money to PGI on August 30, 2012, but documents establish that he wrote a check to PGI which was processed on September 5, 2012. (Doc. 34, pp. 3, 25, 45, 47, 53).

that Michael Duesing sent Mr. Beatty an interest payment in 2015. (Doc. 34, p. 27).[8]

SpineSource alleges that a balance of $103,846.72 plus interest remains outstanding.

(Doc. 1-2, pp. 4–6).

The May, July, and August 2012 loans are not documented in a formal agreement. (Doc. 43, pp. 19–20). There was an oral agreement between Ashlee Duesing and Mr. Beatty. (Doc. 43, p. 13). Michael Duesing and Mr. Beatty exchanged a draft agreement, but the agreement was not finalized. (Doc. 43, pp. 13, 20). Michael Duesing testified:

> [Mr. Beatty] had initially generated an agreement that I had issues with that he had gotten off Legal Zoom. I'd asked him to resend it to me. I wanted to structure the loan as a loan to the company versus to us personally, because the payment of the loan has to go back to us personally, which is then income and it created a big burden, whereas if we had loaned it—the structure had been set up to loan the company money, the company could have paid it back without all the tax issues.
>
> Q: Okay. So if it were structured to the company that would have been better for tax purposes?
>
> A: Well, it would have—yes, because it would have taken the—I have to pay myself as income to then repay the loan.
>
> Q: Did you try to make sure that was done or did you try to make sure that it was to the company as opposed to individual?
>
> A: I tried.
>
> Q: What happened, I mean why didn't it go to the company?

---

[8] In his affidavit, Michael Duesing stated that he "made all payments to Bryant Bank and to Sloan Beatty from [his] personal bank account." (Doc. 34, p. 4, ¶ 28).

> A:  I can't communicate—I don't communicate with her brother and I
> can't get information from her.

(Doc. 43, p. 20).

In an August 30, 2012 email to Mr. Beatty regarding the last $50,000 installment, Michael Duesing (writing from his PGI email account) tied the August 2012 $50,000 loan to PGI's payables for rent, payroll, and other obligations and stated that he believed "a draw of $50K will carry us through"—in this context, "us" appears to refer to PGI.  (Doc. 34, p. 52).  Michael Duesing wrote:  "Given that these monies are structured as a 'loan' from Ashlee and I personally to Produkt Glas; the wire will have to go to our personal account."  (Doc. 34, p. 52).

Michael Duesing regained control of PGI in January 2014 and removed Ashlee Duesing and Sloan Beatty as his attorney-in-fact in June 2015.  (Doc. 34, p. 2, ¶¶ 8–12; Doc. 34, pp. 19–24).  After PGI merged into Varaspec on December 30, 2016, Varaspec became responsible for the "valid and legally enforceable" obligations of PGI.  (Doc. 1-1, pp. 2–3, ¶¶ 4–6).  Under the Duesings' 2017 divorce decree, Michael Duesing received "[a]ll right, title and interest to the business entity known as 'Produkt Glas,'" and became "solely responsible for all debt associated therewith."  (Doc. 34, p. 67).  In August 2019, Michael Duesing filed a petition for bankruptcy, and he received an order of discharge in December 2019.  (Doc. 34, pp. 4–5, ¶¶ 33–36; Doc. 34, pp. 69–74).  "Generally, a discharge removes the debtors' personal liability for debts owed before the debtors' bankruptcy case was filed."

(Doc. 34, p. 73).  SpineSource did not file a claim in response to the bankruptcy petition or object to the discharge.  (Doc. 34, p. 5, ¶ 37).

## III.

### Breach of contract

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages."  *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020) (quoting *Schaffer v. Regions Fin. Corp.*, 29 So. 3d 872, 880 (Ala. 2009)).[9]  "The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement."  *Stacey v. Peed*, 142 So. 3d 529, 531 (Ala. 2013) (quoting *Hargrove v. Tree of Life Christian Day Care Ctr.*, 699 So. 2d 1242, 1247 (Ala.

---

[9] A federal court in a diversity case must "apply the laws, including principles of conflict of laws, of the state in which the federal court sits."  *O'Neal v. Kennamer*, 958 F.2d 1044, 1046 (11th Cir. 1992) (citing *Goodwin v. George Fischer Foundry Sys., Inc.*, 769 F.2d 708, 711 (11th Cir. 1985)). For contract claims, Alabama's choice of law rule "provides that the law of the state wherein the contract was executed governs questions regarding the validity and interpretation of the contract." *Am. Nonwovens, Inc. v. Non Wovens Eng'g, S.R.L.*, 648 So. 2d 565, 567 (Ala. 1994) (citing *Harrison v. Ins. Co. of N. Am.*, 318 So. 2d 253, 257 (Ala. 1975); *Macey v. Crum*, 30 So. 2d 666, 669 (Ala. 1947); *Furst & Thomas v. Sandlin*, 94 So. 740, 742 (Ala. 1922)).

The parties did not specifically indicate the state in which the loan transactions occurred.  In its complaint, SpineSource asserts:  "A substantial portion of the events giving rise to this action occurred in Madison County, Alabama where Produkt Glas was formed and transacted business, and where Duesing resided during the majority of time when said events occurred."  (Doc. 1-2, p. 2, ¶ 5).  The Wells Fargo bank records which reflect loan deposits and transfers to PGI are addressed to the Duesings in Huntsville, Alabama.  (*See, e.g.*, Doc. 34, p. 42).  Varaspec relies on Alabama law in its motion for summary judgment.  (Doc. 35).  For these reasons, the Court applies Alabama law to the contract claims in this matter.

1997)). "Proof of an implied contract requires the same basic elements as an express contract." *Stacey*, 142 So. 3d at 531 (citing *Steiger v. Huntsville City Bd. of Educ.*, 653 So. 2d 975, 978 (Ala. 1995)).

Viewed in the light most favorable to SpineSource, the evidence indicates that Mr. Beatty agreed to loan his sister and her husband a total of $120,000 using a line of credit in SpineSource's name. Though PGI was not a party to the loan agreement that Michael Duesing acknowledged in writing in August of 2012, PGI was the intended beneficiary of the loan proceeds. (Doc. 34, p. 4, ¶ 26; Doc. 34, pp. 25, 52–53, 58; Doc. 43, p. 19). The Duesings transferred $75,000 of the $120,000 loan proceeds to PGI. (Doc. 34, p. 4, ¶ 26; Doc. 34, pp. 25, 53, 58). And the Duesings described the loan amounts they retained as replacement for Michael Duesing's salary, a payment that PGI ordinarily would make to Michael Duesing. (Doc. 34, pp. 25, 53; Doc. 43, p. 13).

But PGI's capacity as a third-party beneficiary of the agreement between Mr. Beatty and/or SpineSource and the Duesings does not place PGI in the Duesings' shoes for purposes of a breach of contract claim. It is undisputed that there was no direct loan agreement between SpineSource and PGI, so SpineSource cannot establish an express contract between itself and PGI.[10] Because proof of "an offer

---

[10] While a third-party beneficiary may sue to enforce the benefit of a contract, the Court has located no authority which suggests that a third-party beneficiary may be sued for breach of contract. *See, e.g.*, *Solnes v. Wallis & Wallis, P.A.*, No. 13–61225–CIV, 2013 WL 3771341, at *4 (S.D. Fla. July

and an acceptance, consideration, and mutual assent to the essential terms of the agreement" also are necessary to establish an implied contract, *Stacey*, 142 So. 3d at 531, SpineSource fares no better under an implied contract theory against PGI/Varaspec.[11]  The evidence demonstrates that Michael Duesing preferred a loan between Mr. Beatty and/or SpineSource and PGI, but Mr. Beatty opted for a loan arrangement with the Duesings.

Because SpineSource has not identified an express or an implied contract with PGI/Varaspec, its claim for breach of contract fails as a matter of law.

### Money lent and unjust enrichment

A claim for money lent is available when a plaintiff has paid money to a defendant as a loan.  *See Stacey*, 142 So. 3d at 532–33 (quoting 42 C.J.S. *Implied*

---

18, 2013) ("[E]ven if a non-party is an expressly intended beneficiary of the contract, the parties have directed the Court to no authority indicating that such a beneficiary may *be sued* for breach of contract, and the Court has likewise found no such authority. . . . [A]llowing for such a cause of action would transgress principles of contract law because a third-party beneficiary need not be aware of or agree with the contract to which he or she is a third-party beneficiary.  It would therefore be unfair to bind a third party to actions to which it did not affirmatively agree.") (emphasis in *Solnes*); *Mendez v. Hampton Court Nursing Ctr., LLC*, 203 So. 3d 146, 149 (Fla. 2016) ("Critically, the third-party beneficiary doctrine enables a non-contracting party to enforce a contract against a contracting party—not the other way around. . . . The third-party beneficiary doctrine does not permit two parties to bind a third—without the third party's agreement—merely by conferring a benefit on the third party.") (internal citations omitted); *Green v. Flanagan*, 730 S.E.2d 161, 164 (Ga. Ct. App. 2012) ("[W]e are aware of no authority . . . for the proposition that a third-party beneficiary of a contract can be sued for damages for its breach.").

[11] Because no express contract exists in this case, the Court may consider SpineSource's implied contract claims.  *See Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 447 (Ala. 1996) ("[U]nder Alabama law, claims of both an express and an implied contract on the same subject matter are generally incompatible.") (collecting cases).

*Contracts* § 2 (2007)).  "The three elements of a claim on money lent are that the money was delivered to the defendant, the money was intended as a loan, and the loan has not been repaid."  *Stacey*, 142 So. 3d at 533 (quoting 42 C.J.S. *Implied Contracts* § 2 (2007)).[12]

"To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that:  (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation."  *Portofino Seaport Vill., LLC v. Welch*, 4 So. 3d 1095, 1098 (Ala. 2008) (citing *Am. Family Care, Inc. v. Fox*, 642 So. 2d 486, 488 (Ala. Civ. App. 1994)).  The plaintiff must establish that:

> the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud.  The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.

*Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006) (quoting *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003)) (internal quotations, emphasis, and citations omitted).

---

[12] It may be more appropriate to bring a claim for money lent as a claim of "money due on an open account," in which "[a] plaintiff establishes a prima facie case . . . by presenting evidence that money was delivered to the defendant, that it was a loan, and that it has not been repaid."  *Stacey*, 142 So. 3d at 533 (quoting *Livingston v. Tapscott*, 585 So. 2d 839, 841 (Ala. 1991)).  The *prima facie* case for both claims is identical.

"One is unjustly enriched if his retention of a benefit would be unjust."

*Matador Holdings, Inc. v. HoPo Realty Invs., L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011)

(quoting *Jordan v. Mitchell*, 705 So. 2d 453, 458 (Ala. Civ. App. 1997)).

> Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been *unjustly* enriched.

*Matador Holdings*, 77 So. 3d at 145–46 (Ala. 2011) (quoting *Welch v. Montgomery Eye Physicians, P.C.*, 891 So. 2d 837, 843 (Ala. 2004), in turn quoting *Jordan*, 705 So. 2d at 458) (emphasis in *Jordan*). "The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case." *Mantiply*, 951 So. 2d at 655 (citing *Heilman*, 876 So. 2d at 1123).

SpineSource's money lent claim fails for the same reason that its contract claim fails; SpineSource did not loan money to PGI. SpineSource's unjust enrichment claim likewise fails on the record in this case. PGI received a benefit; the Duesings used the money they received from SpineSource to keep PGI afloat. But SpineSource has not presented evidence that it acted under a mistake of fact or in misreliance on a right or duty or that PGI/Varaspec engaged in unconscionable conduct. Therefore, SpineSource cannot establish that PGI was enriched unjustly,

14

and SpineSource cannot recover from PGI/Varaspec under a money lent theory or an unjust enrichment theory.

*Money had and received*

Under Alabama law, to establish a claim for money had and received, a plaintiff must demonstrate that a defendant "*holds* money which, in equity and good conscience, belongs to plaintiff or *holds* money which was improperly paid to defendant because of mistake or fraud." *Hancock-Hazlett Gen. Constr. Co. v. Trane Co.*, 499 So. 2d 1385, 1387 (Ala. 1986) (citing *Foshee v. Gen. Tel. Co. of the Se.*, 322 So. 2d 715 (Ala. 1975); *Wash v. Hunt*, 202 So. 2d 730 (Ala. 1967)) (emphasis in *Hancock-Hazlett*).  A claim for money had and received:

> is founded upon the equitable principle that no one ought justly to enrich himself at the expense of another, and is maintainable in all cases where one has received money under such circumstances that in equity and good conscience he ought not to retain [] because in justness and fairness it belongs to another.
>
> [A] cause of action for money had and received is *less restricted and fettered by technical rules and formalities than any other form of action.* It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which . . . belongs to the plaintiff.

*Jewett v. Boihem*, 23 So. 3d 658, 661 (Ala. 2009) (quoting *Staats v. Miller*, 243 S.W.2d 686, 687–88 (Tex. 1951)) (emphasis in *Jewett*) (internal citations and quotations omitted).  "It is not necessary . . . to prove that money belonging to the plaintiff was actually and physically given to, and received by the defendant, as it is

sufficient to show that . . . the defendant has received the benefit *indirectly*." *Jewett*, 23 So. 3d at 662 (quoting 42 C.J.S. *Implied Contracts* § 19, at 27 (2007)) (emphasis in *Jewett*).  The defendant in an action for money had and received must have possession of money that in equity belongs to the plaintiff.  *Hancock-Hazlett*, 499 So. 2d at 1387.

It is undisputed that the Duesings transferred $75,000 of the $120,000 loan proceeds to PGI.  (Doc. 34, p. 4, ¶ 26; Doc. 44, p. 2).  For SpineSource to recover from PGI/Varaspec, SpineSource must demonstrate that Varaspec still possessed loan proceeds in August of 2018 when SpineSource filed this action.  It appears that PGI repaid part of the loan to Ashlee Duesing between 2012 and 2014.  (Doc. 34, p. 58).  But Varaspec has not demonstrated that it did not still retain proceeds of the May 2012 or the August 2012 loans in August of 2018.

In response to SpineSource's complaint, Varaspec initially filed an answer and third-party complaint against Ashlee Duesing.  (Doc. 5).  In the third-party complaint, Varaspec alleged that "[f]rom October 17, 2012 through February 27, 2014, Produkt Glas repaid [Ashlee Duesing] $75,000 for the express purpose of using those funds to repay her loan to her brother," but Ashlee Duesing "only used $23,880.39 of the $75,000 to pay her brother."  (Doc. 5, p. 6, ¶¶ 8–9).  Ashlee Duesing denied the allegations.  (Doc. 14, p. 2, ¶¶ 8–9).  Varaspec voluntarily dismissed its third-party complaint against Ashlee Duesing, (Docs. 31, 32), but in its

summary judgment motion, Varaspec repeats its contention that "Varaspec repaid the money to the Duesing[s'] personal account . . . ." (Doc. 35-1, p. 6). Varaspec cites Doc. 34, pp. 53–60 to support its contention. (Doc. 35-1, p. 6).[13]

The evidence Varaspec cites begins with a December 31, 2012 PGI "Account QuickReport." (Doc. 34, p. 53). Handwritten notations on the document state: "loan to PG" and "File Under 'A. Duesing Loan.'" The account includes two positive entries: $28,000—with the handwritten notation, "30,000.00-2,000.00"—and $45,000. (Doc. 34, p. 53). The values correspond with the $30,000 (minus $2,000) and $45,000 the Duesings transferred to PGI from the SpineSource loan. The remaining entries show three deductions from the $73,000 total, two of which are labeled "Payment on loan." (Doc. 34, p. 53). The final balance on the report is $63,900. (Doc. 34, p. 53; *see also* Doc. 34, p. 58).

The next document is a "Liability Register" with a handwritten date of February 5, 2014. (Doc. 34, p. 54). The register includes entries from December 31, 2012 to February 1, 2014 and shows an initial balance of $63,900 reduced by February 1, 2014 to $1,420. (Doc. 34, p. 54).[14] All payments are listed to an account

---

[13] Varaspec mistakenly cites Doc. 14; Doc. 34 is the evidentiary document to which Varaspec refers.

[14] This date range roughly corresponds to Varaspec's allegation in its third-party complaint that "[f]rom October 17, 2012 through February 27, 2014, Produkt Glas repaid [Ashlee Duesing] $75,000 . . . ." (Doc. 5, p. 6, ¶ 8).

in the name of Ashlee Duesing, and three of the eighteen entries are titled "Repayment on loan." (Doc. 34, p. 54). The remaining documents cited support the information in the first two documents. (Doc. 34, pp. 55–60).[15]

Viewed in the light most favorable to SpineSource, evidence in the record does not conclusively establish that Varaspec repaid the entire $75,000 to Ashlee Duesing. At a minimum, the evidence submitted shows a remaining balance of $1,420. (Doc. 34, p. 54). Only certain entries in the PGI records are labeled "Loan Repayment" or "Repayment on loan"; others are not labeled. At this stage of the litigation, the Court must infer from the entries labeled "Loan Repayment" that unlabeled entries for payments to Ashlee Duesing are not loan repayments.

Because Varaspec has not established as a matter of law that it does not hold funds that in equity belong to SpineSource, a factfinder will have to examine the parties' evidence to determine whether Varaspec, as the successor in interest to PGI, holds part of the $75,000 in loan proceeds which Ashlee and Michael Duesing

---

[15] A PGI "Transaction List" dated August 20, 2013 contains the same transactions as recorded in the liability register. Four additional entries are labeled "Loan Repayment." A handwritten notation explains that $21,670 of the $63,900 beginning entry remained to be paid as of August 2013. (Doc. 34, p. 56). An older version of the liability register includes a handwritten sticky note that states "Ashlee Loan." (Doc. 34, p. 55). A box in the upper left-hand corner of one page of the register states: "NP – Ashlee Duesing," indicating that the liability is a note payable to Ashlee Duesing. The last payment on the older version of the register is dated August 1, 2013. (Doc. 34, p. 55). The updated liability register reflects payments through February 1, 2014. (Doc. 34, p. 54).

transferred to PGI.  Therefore, the Court denies Varaspec's motion for summary judgment on SpineSource's claim for money had and received.

## Conclusion

For the reasons stated above, the Court grants Varaspec's motion for summary judgment on SpineSource's claims for breach of contract, money lent, and unjust enrichment.  The Court denies Varaspec's motion for summary judgment as to SpineSource's claim for money had and received as it relates to the $75,000 that Ashlee and Michael Duesing transferred to PGI from their Wells Fargo account.

**DONE** and **ORDERED** this April 8, 2022.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE